| | | |
|---|---|---|
| UNITED STATES OF AMERICA, *ex rel.* | ) | |
| KEVIN DENNIS; STATE OF TENNESSEE, | ) | |
| *ex rel.* KEVIN DENNIS; and KEVIN DENNIS, | ) | |
| Individually, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Case No. 3:09-cv-00484 |
| | ) | |
| HEALTH MANAGEMENT ASSOCIATES, INC., | ) | Judge Wiseman |
| and LEBANON HMA, INC. d/b/a | ) | |
| UNIVERSITY MEDICAL CENTER, | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION

Before the Court is the Motion to Dismiss Relator's First Amended Complaint (ECF No. 69), filed by defendants Health Management Associates, Inc. ("HMA") and Lebanon HMA, Inc. d/b/a University Medical Center ("UMC"), on the basis that it fails to satisfy the heightened pleading standard set out in Rule 9(b) of the Federal Rules of Civil Procedure, which applies to False Claims Act lawsuits, and that it is therefore subject to dismissal under Rule 12(b)(6). The defendants also assert that further attempts to amend the complaint would be futile, and that the dismissal should therefore be with prejudice. As explained herein, the Court finds the defendants' motion to be meritorious. The motion will be granted and this action dismissed, but without prejudice.

## I. Procedural Background

Defendant UMC is a wholly owned subsidiary of HMA. UMC has owned and operated an acute-care hospital in Lebanon, Tennessee since 2003. The relator, Kevin Dennis, M.D. (referred to herein as "Dennis" or "the relator"), is a physician whom UMC recruited to the Lebanon, Tennessee community in 2007.

Dennis filed the original complaint in this *qui tam* action in May 2009, alleging that the recruitment agreement between Dennis and UMC was a sham contract that violated the Medicare and Medicaid Anti-Kickback Statute, 42 U.S.C. § 1320a-7b ("AKS"), and the "Stark Law," 42 U.S.C. 1395nn. The relator alleged that, as a result of these violations, UMC and HMA committed healthcare billing fraud in violation

of the False Claims Act, 31 U.S.C. §§ 3729–3733 ("FCA"), as well as analogous Tennessee laws. The complaint also alleged that the defendants entered into improper recruitment agreements with other physicians and provided benefits to those physicians in violation of the Stark Law and the AKS; that defendants had treated Medicare and Medicaid beneficiaries whose referrals were tainted by the allegedly illegal agreements, and that the defendants submitted false claims related to the treatment of those beneficiaries.

On December 7 and 8, 2011, the State of Tennessee and the United States gave notice of their respective decisions not to intervene in this matter. (ECF Nos. 40 and 41.) Thereafter, the Court ordered that the complaint be served on the defendants by the relator (ECF No. 43), and directed the relator to file his First Amended Complaint by or before June 29, 2012 (ECF No. 51).

The relator filed the amended complaint on June 29, 2012. Despite the passage of more than three years between the filing of the original and amended complaints, the factual allegations and legal claims in the amended complaint do not appear to differ materially in any respect from those in the original complaint.[1] The defendants filed their motion to dismiss the amended complaint on July 30, 2012. The relator filed his response in opposition to that motion, and the defendants filed a reply brief. The defendants' motion, having been fully briefed, is now ripe for review.

## II. Factual Allegations in the First Amended Complaint

The allegations in the amended complaint are purportedly based upon the relator's personal knowledge and documents in his possession. (First Amended Complaint, ECF No.65 ("FAC"), at 1.) The relator alleges that "he has been engaged in a financial relationship with defendants pursuant to a Physician Recruitment Agreement" "[s]ince July 2007." (FAC ¶ 16.) Although this statement clearly implies a current and ongoing relationship, the relator alleges elsewhere in his complaint that UMC terminated the recruitment contract and its relationship with Dennis in March 2008, meaning that the relator's personal knowledge of UMC's activities is limited to a period of less than one year—from July 2007 through March 2008.

The amended complaint states that it is brought by the United States and the State of Tennessee,

---

[1] The Fraud Enforcement and Recovery Act ("FERA"), Pub. L. No. 111-21, 123 Stat. 1617 (May 20, 2009), amended and renumbered various FCA provisions. The original complaint referred to the FCA provisions by their pre-FERA numeration; the amended complaint refers to the FCA as amended by the FERA. Otherwise, the Court has not detected any significant differences between the original and amended documents.

*ex rel.* Dr. Kevin Dennis, to redress violations of the FCA, the Tennessee Medicaid False Claims Act, Tenn. Code Ann. §§ 75-1-181 *et seq.* (the "TMFCA"), and the Tennessee False Claims Act, Tenn. Code Ann. § 4-18-103(a), and goes into substantial detail regarding the federal statutory scheme that prohibits payments made to induce physician referrals, including the Stark Law and the AKS, and the various government-funded healthcare programs that are included within the purview of Stark and the AKS.  (*See* FAC ¶¶ 23–68.)

The factual allegations in the amended complaint concerning the defendants' allegedly unlawful conduct are somewhat more succinct, and may be fairly summarized as follows:

The relator alleges very generally, in the "summary" section of the amended complaint, that, pursuant to the terms of his and other physicians' "sham" recruitment agreements with UMC and HMA, the physicians' receipt of financial remuneration was conditioned upon the physicians' referral of patients for inpatient and/or outpatient hospital services, in violation of Stark and the AKS.  Because the agreements were improperly based on remuneration for referrals, HMA and UMC were prohibited from billing Medicare, Medicaid or other government-funded healthcare programs for services performed by physicians or physician practices that had referred patients to UMC or other HMA hospitals.  The relator claims that, "[n]onetheless, HMA and [UMC] unlawfully billed government-funded healthcare programs for such unlawfully referred services in violation of the [FCA] and the [TMFCA] and have knowingly accepted substantial sums of money from the Government Plaintiffs that they were not entitled to receive."  (FAC ¶ 69.)

The relator further alleges that in conjunction with the recruitment agreements between UMC (or HMA) and recruited physicians, "defendants have provided office space at below market rents and have provided personnel free of charge or at below market compensation to physicians and physician practice groups that refer patients for out patient services and inpatient stays to [UMC].  These free and below market services are provided to these physicians and practice groups . . . to induce them to continue to refer patients to the hospital. . . ."  (FAC ¶ 72.)  The relator asserts that these practices violate Stark and the AKS, and that the violation of those laws in connection with the referral of patients who are beneficiaries of Medicare, Medicaid or other government-funded healthcare services renders all services provided to such patients ineligible for reimbursement as a matter of law, such that every claim submitted to the United States for such services is a false claim that violates the FCA and the TMFCA.  The relator

specifically claims that the defendants have submitted false cost reports to the United States (FAC § 56), but does not include any factual support for that assertion.

In support of his assertion that UMC's physician recruitment agreements condition the recruited physicians' receipt of financial remuneration upon the physicians' referral of patients for inpatient and/or outpatient hospital services, the relator alleges, with somewhat greater specificity, that he is a licensed physician who was recruited by UMC to enter into a recruitment agreement pursuant to which he relocated his medical practice to Lebanon, Tennessee. The recruitment agreement provided that UMC would supplement Dennis's earnings such that he was guaranteed a net income of not less than $260,000 for the first year, or $21,666,76 per month. UMC also agreed to reimburse certain specific start-up expenses in an amount up to $24,000, and to pay a commitment bonus of $10,000, The relator acknowledges that the recruitment agreement specifically provided that none of the payments by UMC to Dennis were or would be conditioned on referrals to the defendants' facilities. In that regard, the agreement stated: "No Referral Requirements. We don't require you to refer patients to us in order to receive financial recruitment benefits because of this Agreement." (FAC ¶ 87; *see also* ECF No. 79-9 (Recruitment Agreement) ¶ 4.01.)[2]

The relator contends, however, that this provision is "empty lip service" because it is "contradicted" by another provision of the recruitment agreement which required Dennis to "apply for, receive and maintain Provisional Active or Active Medical Staff membership and appropriate clinical privileges at our hospital. You also will follow our hospital's rules, regulations, policies and medical staff bylaws." (*See* FAC ¶ 88; Recruitment Agreement ¶ 5.03.) UMC's medical staff by-laws require Active Staff physicians, in order to maintain their status as such, to refer a minimum of 24 patients annually to UMC's hospital facility for admission. (FAC ¶ 90, ECF No. 79-10, at Art. IV, § 2.)

---

[2] Both parties submitted documents outside the record along with their filings in favor of or in opposition to the motion to dismiss. These documents include the relator's recruitment agreement and UMC's by-laws, both of which are referenced in the complaint and are central to the relator's claims. The Sixth Circuit has held that a court may consider allegations contained in the complaint, as well as exhibits attached to or otherwise incorporated in the complaint, without converting a motion to dismiss to a motion for summary judgment. *Weiner v. Klais & Co.*, 108 F.3d 86, 89 (6th Cir. 1997); *see also* Fed. R. Civ. P. 10(c). Further, "[d]ocuments that a defendant attaches to a motion to dismiss are considered part of the pleadings if they are referred to in the plaintiff's complaint and are central to her claim." *Weiner*, 108 F.3d at 89. In this case, the relator filed the documents with his response in opposition to the motion to dismiss, but the Court finds that they may be considered without converting the defendants' motion into one for summary judgment. Beyond documents that fall within the purview of Rule 10(c) and *Weiner*, however, the Court will not consider other material outside the record the consideration of which would require converting the defendants' motion to dismiss into one for summary judgment.

The relator alleges that after he entered into the recruitment agreement and relocated his practice, administrative personnel employed by the defendants began contacting him "concerning his compliance with certain of the terms of his physician recruitment agreement and have chastised Dr. Dennis for what [the defendants] have labeled inadequate generation of revenues for the hospital through referrals of patients for hospital admissions." (FAC ¶ 82.) He claims that UMC staff "pressured" him to comply with the annual patient referral requirement, and "chastised" him for his failure to comply with the requirement. (FAC ¶ 93.) The relator claims he was informed that his accounts receivables did not meet Medical Group Management Association Standards and that the defendants had "concerns" about how successful Dennis's practice would be upon completion of the income guarantee period in the recruitment agreement. (*Id.*) UMC took remedial action to address its concerns about Dennis's failure to meet the terms of his contract or to develop his practice in Lebanon, including by placing him on hospital unassigned-patient call. (FAC ¶ 94.) Dennis was also "encouraged" to "utilize [the defendants'] Hospitalist Practice group as a remedy to step up his 'lacking' referral 'revenue' in order for him to comply with the hospital Active Staff by-laws with which he agreed to abide in his Physician [Recruitment] Agreement." (*Id.*)

The relator further asserts that he began his required "on call" status in September 2007, and that "[s]olely because of the mandates of his Physician Recruitment Agreement (which required his compliance with [UMC] by-laws which in turn required him to meet a minimum annual patient admission referral quota), Dr. Dennis referred all patients for admission to the [defendants'] Hospitalist Group from September 2007 through March 2008. Dr. Dennis attempted to comply with his Active Staff By-law requirement to prevent a breach of his Physician Recruitment [A]greement that would obligate him to a financial penalty of no less than $260,000.00. Dr. Dennis admitted at least one (1) patient per month and referred an average of twenty (20) patients per month to [defendants]." (FAC ¶ 95.) The defendants nonetheless terminated the recruitment agreement effective March 14, 2008, based on Dennis's failure to comply with the allegedly unlawful patient referral protocols.[3]

The relator avers that Dr. Roger McKinney is a practicing physician on Active Staff at UMC, who

_____

[3] In the amended complaint, the relator also alleged that the termination of the recruitment agreement was in retaliation for his having reported the defendants' unlawful activities in violation of the Stark Law and other federal laws. In his response in opposition to the defendants' motion to dismiss, the relator expressly abandoned his retaliation claim.

leases offices space from defendants.  The relator claims that the defendants provided "substantial" in-kind benefits to McKinney in exchange for his continuing high volume of referrals to UMC.  Specifically, the defendants pay McKinney $60,000 annually for services as "Group Director" of UMC, and provide him free office space.  McKinney is also employed by the defendants as Physician Practice Liaison.  The relator alleges that the $60,000 paid McKinney is "far in excess of the fair market value" of the duties he fills as Group Director, and that the remuneration is paid to him "in exchange for large volumes of referrals (and the attendant large volume of inpatient and outpatient revenues) from Dr. McKinney and the McKinney Group."  (FAC ¶ 100.)  The relator alleges that Stark and the AKS prohibit the defendants from billing Medicare, Medicaid or other government-funded healthcare programs for services performed on patients illegally referred from the McKinney Group.  (FAC ¶ 101.)

Without explaining how, the relator also alleges that Dr. McKinney and the McKinney Group have been provided funding by hiring physicians, such as Dr. Bernard Sy, who are parties to recruitment agreements with the defendants.  (FAC ¶ 102.)

The relator further alleges that he has been notified by a member of defendants' billing staff that UMC ranks tenth in Tennessee for fees-to-patient ratio, that is, that defendants "overbill patients for services rendered and provide substandard healthcare."  (FAC ¶ 104.)  The relator claims that the defendants' "control over referrals obtained through their sham Physician Recruitment Agreements permits [them] to charge the highest medical care costs in the region."  (FAC ¶ 105.)

The relator further alleges that there is no shortage of primary care physicians in and around UMC, and that many primary care physicians in the area struggle to recruit patients.  UMC has nonetheless continued to recruit physicians by offering generous recruitment packages such as that offered to Dennis.  The relator alleges that the purpose of recruiting ever more physicians is to obtain additional referrals "because of the ongoing kickbacks paid by defendants under the guise of the sham Physician Recruitment Agreements."

The "Unlawful Conduct" section of the complaint contains no allegations regarding the submission of false claims.  However, the following assertions regarding the submission of false claims is included in the section titled "First Claim for Relief":

> 117.  Defendants . . . knowingly presented and caused to be presented hundreds of thousands of false claims to the United States from at least 2003 to the present by and through their violations of federal and state laws. . . .

118. For example, defendants knowingly and willfully offered and paid remunerations, including kickbacks and bribes, directly or indirectly, overtly or covertly, in cash and in kind, to group medical practices and individual physicians, including Dr. Dennis, with the intent to induce those physicians and medical practices to refer individuals, including Medicare and Medicaid patients, to HMA, [UMC] and other hospitals owned and operated by HMA, for the furnishing of services for which payment was to be made, in whole or in part, under a federal healthcare program. . . .

119. Defendants' violations of the AKS and the Stark law form the basis for the instant claims under the False Claims Act, 31 U.S.C. § 3729(a)(1)(A). Indeed, the claims submitted or caused to be submitted were false because the Stark law, the AKS and other state and federal laws prohibited defendants billing Medicare for items or services referred or ordered by physicians with whom they had financial relationships.

120. Defendants' unlawful acts were carried out in order to induce physicians to refer patients insured by Federal healthcare programs to HMA-owned inpatient and outpatient facilities. . . .

121. Defendants' unlawful acts were also carried out in order to induce physicians to refer patients insured by Federal healthcare programs to HMA-owned inpatient and outpatient facilities by, *inter alia*:

    a. Paying physicians to locate their practices in HMA Hospital service areas;

    b. Paying money to physicians pursuant to Relocation Agreements/Physician Recruitment Agreements having previously arranged for much of that money to be passed through to established physician practices that defendants had targeted for increased referrals, and to established physicians practices that were loyal referrers of patients to HMA hospitals;

    c. Paying Relocation Agreement/Physician Recruitment Agreement benefits to established physicians whom defendants had targeted for increased referrals, and to established physicians who were loyal referrers of patients to HMA hospitals; and,

    d. Paying physicians pursuant to "employment contracts" for managing, marketing, and expanding their own practices.

122. The United States, . . . unaware of defendants' unlawful and illegal recruitment and billing practices, paid the claims presented by or caused to be presented by defendants as a result of their unlawful and illegal recruitment and billing practices.

(FAC ¶¶ 117–22.) These allegations are incorporated by reference in the sections pertaining to the other claims for relief.

Based on the factual allegations summarized above, the relator purports to assert nine separate claims for relief under federal and state law for: (1) violations of the False Claims Act, 31 U.S.C. § 3729(a)(1)(A), and the Tennessee Medicaid False Claims Act, Tenn. Code Ann. § 71-5-182(a)(1)(A), for presenting, or causing to be presented, false or fraudulent claims for payment or approval (First and Sixth Claims for Relief); (2) violations of the FCA, 31 U.S.C. § 3729(a)(1)(B), and the TMFCA, Tenn. Code Ann. § 71-5-182(a)(1)(B), for knowingly making or using, or causing to be made or used, a false record or

statement material to a false or fraudulent claim (Second and Seventh Claims for Relief); (3) conspiracy to violate the FCA and the TMFCA, in violation of 31 U.S.C. § 3729(a)(1)(C) and Tenn. Code Ann. § 71-5-182(a)(1)(C) (Third and Eighth Claims for Relief; (4) making or using, or causing to be made or used, false records or statements to avoid or decrease an obligation to pay or transmit or refund monies to the United States or the State of Tennessee, in violation of the FCA, 31 U.S.C. § 3729(a)(1)(G), and Tenn. Code Ann. § 71-5-182(a)(1)(D) (Fourth and Ninth Claims for Relief); and (5) violation of the Tennessee False Claims Act, Tenn. Code Ann. § 4-18-103(a), subsections (1), (2), (3), and (7), which create liability and provide for treble damages against any person who knowingly presents a false claim for payment or approval to any state agent, employee, or political subdivision; who knowingly makes, uses or causes to be made or used a false record or statement to get a false claim paid or approved by the state; who conspires to defraud the state; or who makes, uses, or causes to be made or used a false record or statement to conceal, decrease or avoid an obligation to pay money to the state (Tenth Claim for Relief).[4]

The Tenth Claim for Relief, seeking recovery under the Tennessee False Claims Act, Tenn. Code Ann. § 4-18-103, is clearly redundant of the claims for relief asserted under the TMFCA, Tenn. Code Ann. §§ 71-5-182(a)(1). The claims under the TMFCA are likewise co-extensive with those asserted under the FCA; therefore, the FCA analysis also applies to the relator's claims under the TMFCA. *See In re Knox County, Tennessee ex rel. Envtl. Termite & Pest Control, Inc.*, No. E2007–02827–COA–R3–CV, 2009 WL 2144478, at *4 (Tenn. Ct. App. July 20, 2009) (applying federal law construing the FCA to a cause of action brought under the Tennessee False Claims Act). The discussion herein will therefore focus on the FCA claims. Because the FCA claims for relief (First, Second, Third, and Fourth Claims for Relief) are subject to dismissal for failure to state a claim under Rule 12(b)(6) on the basis of the relator's failure to allege fraud with the specificity required by Rule 9(b), the analogous claims under Tennessee law are likewise subject to dismissal.

## III.    Standard of Review

The FCA prohibits making false or fraudulent claims for payment by the federal government. *See generally* 31 U.S.C. § 3729(a). A private individual, known as a relator, may bring a civil action for a violation of the FCA, also known as a *qui tam* suit, on behalf of the government. *See id.* § 3730(b)(1). On

---

[4] As mentioned above, the complaint also includes a retaliation claim as the Fifth Claim for Relief, which the relator has expressly abandoned. That claim will therefore be dismissed without discussion.

a motion to dismiss, a complaint alleging violations of the FCA must satisfy the pleading requirements set forth in both Rule 12(b)(6) and Rule 9(b) of the Federal Rules of Civil Procedure.

A relator's amended complaint should only be dismissed under Rule 12(b)(6) if it "fail[s] to state a claim upon which relief can be granted." Generally, a complaint must merely contain a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). In considering whether a complaint states a claim, the district court "must read all well-pleaded allegations of the complaint as true." *Weiner v. Klais and Co.*, 108 F.3d 86, 88 (6th Cir. 1997). The court is not required to accept as true legal conclusions, or legal conclusions couched as factual allegations. *Ashcroft v. Iqbal*, 556 U.S. 662, 678–79 (2009). To survive a motion to dismiss, the plaintiff's complaint must set forth more than "a formulaic recitation of the elements" of a cause of action. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).

That is, a plaintiff must plead "enough facts to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 556). "The plausibility standard . . . asks for more than a sheer possibility that a defendant has acted unlawfully. Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of "entitlement to relief."'" *Id.* (quoting *Twombly*, 550 U.S. at 557). Finally, the complaint must be construed in a light most favorable to the party opposing the motion to dismiss. *Davis H. Elliot Co. v. Caribbean Utils. Co.*, 513 F.2d 1176, 1182 (6th Cir. 1975).

Because the claims in this case are premised upon allegations of fraud, the complaint is also governed by Rule 9(b), which requires that "in any complaint averring fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity." *Yuhasz v. Brush Wellman, Inc.*, 341 F.3d 559, 563 (6th Cir. 2003). The Sixth Circuit has made it clear that the heightened pleading standard set forth in Rule 9(b) applies to complaints alleging violations of the FCA. *Id.* To satisfy Rule 9(b), a plaintiff must at a minimum "allege the time, place, and content of the alleged misrepresentation" as well as "the fraudulent scheme; the fraudulent intent of the defendants; and the injury resulting from the fraud." *Bennett v. MIS Corp.*, 607 F.3d 1076, 1100 (6th Cir. 2010) (internal citations omitted). A complaint's failure to comply with Rule 9(b)'s pleading requirements is treated as a failure to state a claim under Rule

12(b)(6). *United States ex rel. Howard v. Lockheed Martin Corp.*, 499 F. Supp. 2d 972, 976 (S.D. Ohio 2007).

## IV.    The Applicable Law

### A.    The FERA Amendments to the FCA

This case is brought pursuant to the FCA, which provides civil penalties for presenting a false claim for payment against the Government.  *See Sanders v. Allison Engine Co.*, Nos. 10–3818, 10–3821, 2012 WL 5373532, at *9 (6th Cir. Nov. 2, 2012).  The Fraud Enforcement and Recovery Act of 2009 ("FERA"), Pub. L. No. 111-21, 123 Stat. 1617 (May 20, 2009), amended and renumbered various FCA provisions.  The amended complaint purports to proceed under the FCA's post-FERA provisions, as reflected by the fact that the first four claims for relief assert such claims under 31 U.S.C. § 3729(a)(1)(A), (B), (C), and (G), which did not exist prior to FERA.

The FERA expressly provides that its amendments "shall take effect on the date of enactment of this Act and shall apply to *conduct* on or after the date of enactment," May 20, 2009, except that § 3729(a)(1)(B) "shall take effect as if enacted on June 7, 2008, and apply to all claims under the False Claims Act . . . that are *pending* on or after that date."  FERA § 4(f), 123 Stat. at 1625 (emphasis added). In other words, as is relevant to the relator's claims here, subsections (A), (C) and (G) of 31 U.S.C. § 3729(a)(1) are not retroactive, and only apply to conduct that took place on or after May 20, 2009. Subsection (B), however, applies to all "claims" that were "pending" on or after June 7, 2008.  The defendants argue that this retroactivity provision violates the Ex Post Facto Clause of the Constitution, citing *United States ex rel. Sanders v. Allison Engine Co.*, 667 F. Supp. 2d 747 (S.D. Ohio 2009).  After the defendants filed their motion, however, the Sixth Circuit issued its opinion reversing that district court decision.  *See Sanders. Sanders v. Allison Engine Co.*, *supra*, 2012 WL 5373532 (6th Cir. Nov. 2, 2012). There, the Sixth Circuit held, among other things, that the term "claim," as used in FERA § 4(f), 123 Stat. at 1625, meant "case" or "civil action," *id.* at *6–*7, and that the retroactivity provision of FERA did *not* violate the Ex Post Facto Clause or the Due Process Clause.  *Id.* at *14, *15.

The original complaint in this action was filed on May 27, 2009, well after June 7, 2008.  The FERA amendment to the FCA codified at 31 U.S.C. § 3729(a)(1)(B) therefore applies to the relator's second claim for relief in this case.  However, with respect to the FCA claims set forth in the relator's first, third, and fourth claims for relief, although the amended complaint purports to cover ongoing activity "to

the present" (FAC ¶ 4), it does not contain any particularized allegations regarding the defendants'

conduct—or any basis for the relator's personal knowledge of the defendants' conduct—beyond the

termination of the relator's recruitment contract on March 14, 2008. Because FERA's amended

provisions in 31 U.S.C. § 3729(a)(1)(A), (C), and (G) are inapplicable to conduct that occurred before

2009, they are inapplicable to the defendants' alleged conduct. The Court therefore construes the

relator's first, third and fourth claims for relief as proceeding under the FCA's text and numbering that

predate FERA.[5]

### B.     The Relevant Provisions of the FCA

The applicable pre-FERA terms of the FCA establish liability for any person who:

> (1) knowingly presents, or causes to be presented, to an officer or employee of the United States Government or a member of the Armed Forces of the United States a false or fraudulent claim for payment or approval;
>
> . . . .
>
> (3) conspires to defraud the Government by getting a false or fraudulent claim allowed or paid; [or]
>
> (7) knowingly makes, uses, or causes to be made or used, a false record or statement to conceal, avoid, or decrease an obligation to pay or transmit money or property to the Government[.]

31 U.S.C. § 3729(a)(1), (3), and (7) (2008).

The amended version of 31 U.S.C. § 3729(a)(2), now codified at 31 U.S.C. § 3729(a)(1)(B),

creates liability for any person who "knowingly makes, uses, or causes to be made or used, a false record

or statement material to a false or fraudulent claim,"[6] as the term "claim" is defined by the statute.

The term "claim" is defined under the pre-FERA version of the FCA to include:

> any request or demand . . . for money or property which is made to a contractor, grantee, or other recipient if the United States Government provides any portion of the money or property which is requested or demanded, or if the Government will reimburse such contractor, grantee, or other recipient for any portion of the money or property which is requested or demanded.

31 U.S.C. § 3729(c) (2008). The FERA amendment provided some additional clarity to the definition:

> (2) the term "claim"--

---

[5] In any event, it is not clear that the revisions have any effect on the analysis of the allegations herein.

[6] The prior version created liability for any person who "knowingly makes, uses, or causes to be made or used, a false record or statement *to get a* false or fraudulent claim paid or approved by the Government."

(A) means any request or demand . . . for money or property and whether or not the United States has title to the money or property, that--

(i) is presented to an officer, employee, or agent of the United States; or

(ii) is made to a contractor, grantee, or other recipient, if the money or property is to be spent or used on the Government's behalf or to advance a Government program or interest, and if the United States Government--

(I) provides or has provided any portion of the money or property requested or demanded; or

(II) will reimburse such contractor, grantee, or other recipient for any portion of the money or property which is requested or demanded; and

(B) does not include requests or demands for money or property that the Government has paid to an individual as compensation for Federal employment or as an income subsidy with no restrictions on that individual's use of the money or property[.]

31 U.S.C. § 3729(b)(2) (2009).

The FCA has always included a *qui tam* provision that allows a private party to bring suit on behalf of the United States to allege fraud upon the United States. *See* 31 U.S.C. § 3730(b). The United States has a statutory right to intervene and take over prosecution of an FCA case. If it chooses not to, as in this case, the FCA's *qui tam* provisions award successful relators of fraud who proceed independently a reasonable amount of the proceeds or settlement. *Id.* § 3730(d)(2); *see United States ex rel. Dick v. Long Island Lighting Co.*, 912 F.2d 13, 18 (2d Cir. 1990) ("'The purpose of the *qui tam* provisions of the False Claims Act is to encourage private individuals who are aware of fraud being perpetrated against the Government to bring such information forward.'") (quoting H.R. Rep. No. 99–660, at 22 (1986)).

In an attempt to identify the requisite false claims that are essential to an action under the False Claims Act, the relator in the present case relies on presumably false claims submitted pursuant to allegedly illegal referral relationships in violation of the AKS and the Stark Law. The AKS is a criminal statute which makes it a felony for:

whoever knowingly and willfully offers or pays any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind to any person to induce such person—(A) to refer an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under subchapter XVIII of this chapter or a State health care program, or (B) to purchase, lease, order, or arrange for or recommend purchasing, leasing, or ordering any good, facility, service, or item for which payment may be made in whole or in part under subchapter XVIII of this chapter or a State health care program. . . .

42 U.S.C. § 1320a–7b(b)(2). Thus, the AKS focuses on the circumstances surrounding the referrals

themselves, but does not create a private cause of action.

The Stark Law is designed to prevent abusive self-referrals. Under the Stark Law, a physician is prohibited from making any referral to a provider of designated health services if the physician has a "financial relationship" with the provider, unless an exception applies. 42 U.S.C. § 1395nn(a). "Financial relationship" is further defined as a compensation arrangement between the physician and the provider, and a "compensation arrangement" is defined as "any arrangement involving any remuneration between a physician (or immediate family member of such physician) and an entity other than an arrangement involving only remuneration described in subparagraph (C)." 42 U.S.C. § 1395nn(a)(2) and (h)(1)(A). Under this statute, a healthcare provider is prohibited from submitting claims to government payors for services rendered to patients referred in violation of the statute, and government payors are prohibited from paying such claims. 42 U.S.C. § 1395(g)(1). The Stark Law is enforced by the Office of the Inspector General. 42 C.F.R. § 1003.102(a)(b).

Although neither the Stark Law nor the AKS provides for a right of private enforcement, *see West Allis Mem'l Hosp., Inc. v. Bowen*, 852 F.2d 251 (7th Cir. 1988), it is well established that claims for remuneration made to the government in violation of AKS and Stark may violate the FCA. This is the theory under which the relator proceeds in this case.

**V.      Analysis and Discussion**

To plead fraud, and a violation of the FCA, with particularity, the plaintiff must allege (1) "the time, place, and content of the alleged misrepresentation," (2) "the fraudulent scheme," (3) the defendant's fraudulent intent, and (4) the resulting injury. *Chesbrough v. VPA, P.C.*, 655 F.3d 461, 467 (6th Cir. 2011) (citation omitted). The defendants argue that the amended complaint in this case fails to plead fraud with the particularity required by Rule 9(b), insofar as (1) the complaint does not identify with particularity any false claim actually submitted by the government (first and second claims for relief); (2) the complaint does not identify any false statement that was made or used that was material to a false or fraudulent claim for payment (second claim for relief); (3) the complaint does not plead the elements of a conspiracy to defraud with sufficient particularity (third claim for relief); and (4) the complaint does not identify a false statement made to avoid an obligation to the government (fourth claim for relief). The defendants further argue that the complaint fails to state a claim based on the recruitment agreement's requirement that contracting physicians maintain active staff privileges at UMC, which in turn requires the admission of at

least twenty-four patients per year. The Court finds the defendants' argument persuasive with respect to each of these points. Because the complaint as a whole is subject to dismissal under Rules 9(b) and 12(b)(6), the Court does not reach the defendants' argument that the complaint does not provide a basis for holding defendant HMA liable for the actions of its subsidiary.

> **A.** **The Complaint Fails to Adequately Plead the Presentation of a False Claim to the Government as Required to Support the First and Second Claims for Relief**

To state a claim for relief under 31 U.S.C. § 3729(a)(1) (pre-FERA), the relator must show that the defendants "(1) knowingly present[ed] [to the United States government] a false or fraudulent claim for payment or approval." Thus, for purposes of the relator's first claim for relief, the relevant elements of the claim—and the elements that must be pleaded with sufficient particularity—are a "'fraudulent scheme' and [a] 'misrepresentation'—the actual presentment of a false claim to the government." *Chesbrough*, 655 F.3d at 467. The allegations in this case are insufficient either to show a fraudulent scheme or, in the absence of allegations giving rise to a strong inference that the defendants were engaged in a fraudulent scheme, the presentment of a false claim to the government.

> 1. *The Relator Fails to Allege a Fraudulent Scheme Related to the Relator's Recruitment Agreement*

The crux of the relator's claims, and, in fact, the only arena in which the relator offers allegations of any specificity whatsoever, concern his own recruitment agreement with UMC. The only allegedly improper referrals to which the relator makes reference in the amended complaint are based on the language of the recruitment agreement that required him to maintain active staff membership at UMC. The relator asserts that this requirement in his own recruitment agreement, and presumably in the recruitment agreements used by UMC and HMA with other physicians, was improper and amounted to an indirect requirement that he (and presumably other recruited physicians) refer patients to UMC, based on the fact that UMC's bylaws required active staff to admit at least twenty-four patients per year in order to maintain their status as "active" staff members.

Irrespective of the fact that the plaintiff actually does not allege that he (or anyone else) made improper referrals, as discussed below, the Court finds that the contractual requirement that a physician maintain active staff status is not equivalent to a referral requirement. The wording of UMC's bylaws indicates that levels of physician privileges are merely a method of classification. Doctors designated at other levels of classification remain entitled to admit patients and to treat patients in the hospital; they

simply are not held to the same level of administrative responsibility. As an Illinois district court has stated in an identical context, "the classification system is nothing more than a customary way of linking a physician's administrative and participatory responsibilities to his/her usage of the facility; physicians who routinely make greater use of the facility are expected to take on more responsibility and become more involved than a physician who seldom uses the facility." *United States ex rel. Perales v. St. Margaret's Hosp.*, 243 F. Supp.2d 843, 864 (C.D. Ill. 2003).

Even assuming *arguendo* that the requirement that recruited physicians maintain active staff status could somehow be construed as a referral requirement, CMS has determined in the context of recruitment that a hospital or other entity entering into a recruitment agreement "may require as a condition for receiving benefits that the practitioner maintain staff privileges at the entity." 42 CFR § 1001.952(n)(4). It is a common and well known practice of hospitals to classify active staff based in part on the number of admissions per year, and CMS necessarily was aware of that fact when it chose not to prohibit staff membership as a requirement in physician recruitment agreements. The relator himself was subject to a recruitment agreement, and he has failed to identify any other physicians who were contractually obligated to maintain active staff status who did not fall into a category where such a requirement is permissible.

In sum, to the extent the alleged "false claims" referenced in the amended complaint are based upon the relator's assertion that his recruitment agreement violated the Stark Law or the AKS because it included a requirement that he obtain and maintain active staff status at UMC, and that active staff membership entailed a referral requirement, such allegations are insufficient as a matter of law to show the existence of a fraudulent scheme that could give rise to a false claim to the government.[7]

       2.       *The Relator Fails to Allege a Fraudulent Scheme Related to the UMC's Relationship with McKinney or Otherwise*

The remaining claims in the amended complaint are premised upon (1) an allegedly improper relationship between UMC and Dr. McKinney and the McKinney Group; (2) the allegedly improper funneling of money to McKinney and similar practice groups who hire physicians who are in recruitment agreements with UMC; (3) the defendants' allegedly improper practice of continuing to enter into

---

[7] The fact that UMC's personnel allegedly encouraged and pressured Dennis to comply with the terms of his recruitment agreement, and "chastised" him for failing to do so, is simply not material to the question of whether the agreement itself contained an illegal referral requirement.

recruitment agreements with primary care physicians although there is no shortage of primary care physicians in the Lebanon area or specifically in the region served by UMC; and (4) UMC's alleged pattern and practice of overbilling for services while providing substandard medical care. The relator seeks to show that these relationships or actions violated the AKS and/or the Stark Law, and that the defendants must have submitted claims that were false because they were tainted by the AKS and Stark violations.

To state a cause of action under that theory, however, the relator must sufficiently allege that the defendants submitted claims that relied upon false certifications of compliance with the AKS or Stark Law. *See United States ex rel. Thompson v. Columbia/HCA Healthcare Corp.*, 125 F.3d 899, 902 (5th Cir. 1997) (holding that a false certification of compliance with the AKS and Stark Law in a Medicare cost report is actionable under the FCA). The mere allegation that a defendant violated the AKS or Stark Law does not create FCA liability unless the defendant knowingly submitted claims that falsely certified compliance with those laws, where such compliance was a prerequisite to payment. *Chesbrough*, 655 F.3d at 467–68; *Thompson*, 125 F.3d at 902. Instead, the relator must allege facts supporting a violation of the elements of the AKS and Stark Law that underlie the supposedly false certification.[8]

In that regard, the amended complaint fails to allege with particularity that the defendants (1) made false certifications (2) about underlying AKS and Stark violations (3) that were tied to claims submitted for improper referrals. The relator simply avers, instead, that the defendants "have submitted false cost reports to the United States." (FAC ¶ 56.) This allegation fails to specify who made the certifications, what was in them, and why they were false (*i.e.*, whether that falsity was due to a knowing noncompliance with a condition of payment, such as violation of the AKS or Stark Law). Further, although the amended complaint contains lengthy descriptions of federal laws and regulations applicable to health care providers, it fails to allege specific facts that could establish an AKS or Stark violation. For example, the relator asserts that the defendants entered into "sham" physician recruitment agreements with ten named physicians (FAC ¶ 70), but does not allege any facts about the circumstances of those

---

[8] The Patient Protection and Affordable Care Act ("PPACA") of 2010 amended the law so that an AKS violation is also a *per se* FCA violation. *See* Pub. L. No. 111-148, § 6402(f)(1), 124 Stat. 119 (2010) (codified at 42 U.S.C. § 1320a-7b(g)). However, PPACA is not retroactive. *See Graham Cnty. Soil & Water Conserv. Dist. v. Wilson*, --- U.S. ----, 130 S. Ct. 1396, 1400 n.1 (2010).

agreements or how they were "sham."[9]

Likewise, the relator also makes numerous conclusory allegations about arrangements between Dr. McKinney and UMC, but he offers no detail to establish AKS or Stark law violations. For example, he alleges that UMC pays Dr. McKinney $60,000 per year to serve as a "Group Director." (FAC ¶ 99.) He concludes that the compensation "is far in excess of the fair market value for Dr. McKinney's duties as a Group Director" (*id.* ¶ 100), but says nothing about what Dr. McKinney's duties were or why $60,000 per year would exceed fair market value compensation for those duties. *Cf. United States ex rel. Osheroff v. Tenet Healthcare Corp.*, No. 1:09-cv-22253, 2012 WL 2871264, at *7 (S.D. Fla. July 12, 2012) (dismissing claims where the relator did not "allege a benchmark of fair market value against which Defendants' rents to physician-tenants can be tested," without which it was impossible to "infer whether Defendants' rents to physician-tenants fall sufficiently below the benchmark so as to constitute remuneration"). Besides this conclusory claim, the relator does not plead sufficient facts to permit the Court to draw the reasonable inference that UMC was paying Dr. McKinney for referrals instead of for legitimate services. The relator's allegations regarding UMC's providing "free office space" and use of a UMC employee "free of charge" to McKinney are similarly devoid of any meaningful detail. (FAC ¶ 99.)

The relator also makes anecdotal allegations that UMC charges patients exorbitant prices for its services that are higher than prices charged to patients by other hospitals for comparable services. (FAC ¶ 104.) The relator offers no specifics regarding what services or what prices or how these allegations result in false claims to the government.

Finally, with respect to the alleged Stark and AKS violations, the amended complaint fails to allege that the physicians identified therein made any prohibited referrals to defendants. To allege an FCA claim based on an underlying Stark or AKS violation, it is not enough to allege that a defendant has an improper financial relationship with a physician. Instead, a relator must allege that the defendant submitted claims to the federal healthcare programs that were provided as the result of an illegal referral. For purposes of a false claim based upon a tainted arrangement, the key consideration is whether a

---

[9] The relator implies these agreements were "sham" for the same reason his was: that they required the physicians to maintain active staff membership at UMC, which in turn required, under UMC's bylaws, that they admit a certain number of patients per year. The Court has already determined, as discussed above, that this requirement did not violate federal law. He also implies that the recruitment agreements were unnecessary because there was already a glut of primary-care physicians in the area, but he does not offer any specific facts to support that claim either.

physician referred a patient for which federal reimbursement was sought.  The amended complaint fails to satisfy this pleading requirement.  Although the relator alleges that UMC entered into "sham" physician recruitment agreements with him and other physicians (FAC ¶ 70, 105, 108), he does not identify a single Medicare or Medicaid beneficiary whom any of these physicians referred to UMC.  Nor does the relator allege that UMC billed any federal or state healthcare program for services referred by any of these doctors.

Perhaps most striking, the relator does not even connect his own allegedly improper arrangement with any of his own referrals of services reimbursed by Medicare or Medicaid.  He alleges that he admitted one patient per month and referred an average of twenty patients per month between September 2007 and March 2008.  (FAC ¶ 95.)  But he never specifically alleges that any of his admissions or referrals were for patients or services that were subsequently billed to a federal healthcare program.  Nor does the relator allege that he accepted money from the defendants in exchange for referring a single patient to UMC that led to a claim by the defendants to the government.  Similarly, although the relator asserts that the defendants provided remuneration to Dr. McKinney "in exchange for large volumes of referrals" (*id.* ¶ 100), he does not actually allege that Dr. McKinney referred any Medicare or Medicaid patient to UMC as a result.

The relator broadly avers that the defendants paid "physicians to induce patient referrals to HMA's facilities, including Lebanon HMA, where the patients referred are beneficiaries of Medicare, Medicaid, and other government-funded healthcare programs" (FAC ¶ 16), but this assertion is insufficient to satisfy Rule 9(b)'s particularity requirement.  Even if the amended complaint contained facts supporting actual payments to induce referrals, the allegations in the complaint further require the Court to assume that the physicians identified therein must have referred Medicare or Medicaid patients to UMC, and that UMC must have then submitted bills to Medicare and Medicaid for these patients.  Such conjecture and presumption cannot serve as the basis of an FCA cause of action.  *See Chesbrough*, 655 F.3d at 472 (affirming Rule 9(b) dismissal of FCA claims where "one must assume that the tests were performed on Medicare or Medicaid patients, and could therefore have been billed to the government."); *United States ex rel. Clausen v. Lab. Corp. of Am.*, 290 F.3d 1301, 1311 (11th Cir. 2002) (Rule 9(b) does not permit relator to state claims based on allegation that "illegal payments must have been submitted, were likely submitted, or should have been submitted to the Government").

In short, the allegations in the complaint do not adequately plead facts showing a fraudulent scheme that resulted in false claims, for purposes of the relator's first claim for relief.

### 3. The Relator Fails to Allege the Presentment of False Claims

Even if the amended complaint adequately alleged a fraudulent scheme for purposes of the first claim for relief, this claim would still be subject to dismissal because the relator has also failed to allege with the required particularity that any false claim was ever presented to the government for payment. In that regard, courts recognize that the critical element of nearly any FCA violation is the actual *presentment* of a false claim to the government for payment or approval. *See United States ex rel. Marlar v. BWXT Y-12, LLC*, 525 F.3d 439, 445 (6th Cir. 2008) (requiring "proof that the alleged false or fraudulent claim was 'presented' to the government"); *United States ex rel. Bledsoe v. Cmty. Health Sys., Inc.*, 501 F.3d 493, 504 (6th Cir. 2007) ("[P]leading an actual false claim with particularity is an indispensable element of a complaint that alleges an FCA violation in compliance with Rule 9(b)"). The submission of a false claim for payment converts an improper financial relationship into an act of fraud upon the government and forms the basis of the cause of action. Thus, even if a relator alleges some underlying fraudulent scheme that would render claims false, the relator can only avoid dismissal by also identifying actual false claims that were submitted to the government. *See Bledsoe*, 501 F.3d at 515 (holding that where relator had alleged "complex and far-reaching scheme," it was insufficient to simply plead a scheme because relator also had to identify representative false claim that was actually submitted to government).

It is the making of the fraudulent claim itself that is "the *sine qua non* of a False Claims Act violation." *Sanderson v. HCA – The Healthcare Co.*, 447 F.3d 873, 878 (6th Cir. 2006) (citation and quotation marks omitted). The Sixth Circuit imposes a "strict requirement that relators identify actual false claims." *Chesbrough v. VPA, P.C.*, 655 F.3d 461, 472 (6th Cir. 2011); *see also Sanderson*, 447 F.3d at 877 (noting that this requirement serves "to alert the defendants to the precise misconduct with which they are charged and [to] protect[] defendants against spurious charges of immoral and fraudulent behavior" (quotation marks omitted; alterations in original)). That is, the relator must, at the very least, "specify the 'who, what, when, where, and how' of the alleged fraud." *Sanderson*, 477 F.3d at 877 (quoting *United States ex rel. Thompson v. Columbia/HCA Healthcare Corp.*, 125 F.3d 899, 903 (5th Cir. 1997)); *see id.* at 877–78 ("The accounting method at the heart of the allegation of fraud in this case is . .

. not a violation of the [FCA], because the statute attaches liability, not to the underlying fraudulent activity . . . but to the claim for payment." (internal quotation marks omitted)).

The relator here has failed to provide the requisite specificity regarding the presentation of a false "claim for payment," which is an indispensable element of his FCA action. Instead, the amended complaint focuses almost exclusively, and superficially, on the allegedly fraudulent activity, asserting that UMC entered into recruitment agreements with physicians and entered into various arrangements with Dr. McKinney that provided remuneration to the physicians in exchange for patient referrals in violation of the AKS and the Stark law. The relator makes only very general and conclusory allegations regarding the submission of claims by the defendants. For instance, he alleges that the defendants "presented and caused to be presented hundreds of thousands of false claims" to the Government. (FAC ¶ 117.) He also alleges that "Defendants have submitted false cost reports to the United States." (Id. ¶ 56.). Nowhere in the complaint, however, does he offer additional detail about the presentation of allegedly false claims for payment, such as when the claims were submitted to the government, or what payment from the government was obtained as a result of such claims. In sum, the relator fails to identify a single false claim for reimbursement that was actually presented to the government for payment.

In *Bledsoe*, the Sixth Circuit "left open the possibility that a court may 'relax' the requirements of Rule 9(b) 'in circumstances where a relator demonstrates that he cannot allege the specifics of actual false claims that in all likelihood exist, and the reason that the relator cannot produce such allegations is not attributable to the conduct of the relator.'" *Chesbrough*, 655 F.3d at 470 (quoting *Bledsoe*, 501 F.3d at 504 n.12). In *Chesbrough*, the court specified that

> the requirement that a relator identify an actual false claim may be relaxed when, even though the relator is unable to produce an actual billing or invoice, he or she has [pleaded] facts which support a *strong inference* that a claim was submitted. Such an inference may arise when the relator has personal knowledge that the [fraudulent] claims were submitted by Defendants . . . for payment.

*Id.* at 471 (internal quotation marks omitted). The Sixth Circuit recognized that other situations might permit relaxation of the specificity requirement, but only when the allegations in the complaint make it "highly likely that a [false] claim was submitted to the government for payment." *Id.* at 472; *cf. United States ex rel. McDonough v. Symphony Diagnostic Servs., Inc.*, No. 2:08–CV–00114, 2012 WL 628515 (S.D. Ohio Feb. 27, 2012) (applying a "relaxed" standard in accordance with *Chesbrough*, where the complained contained "well-pleaded particularities drawn from Plaintiffs' personal experience" of the

existence of a fraudulent "swapping" scheme in violation of the AKS and Stark Law, and which supported a strong inference of the submission of claims that were rendered fraudulent by virtue of the swapping scheme; in addition, the court noted that "[t]he nature of the fraud alleged [did] not lend itself to identifying specific claims," because the plaintiff argued that the swapping scheme resulted in illegal referrals which were themselves billed at "a compliant rate," such that "no particular claim for reimbursement would itself be indicative of the fraud"); *United States ex rel. Lane v. Murfreesboro Dermatology Clinic, PLC*, No. 4:07-cv-00004, 2010 WL 1926131, at *4 (E.D. Tenn. May 12, 2010) (applying relaxed standard where the relator was defendant's former billing clerk with "personal knowledge of the false billing patterns by virtue of her" position, and she described in detail the billing methods through which defendant was able to commit fraud by mischaracterizing the level of services actually performed); *United States ex rel. Fry v. The Health Alliance of Greater Cincinnati*, No. 1:03-CV-167, 2008 WL 5282139, at *13 (S.D. Ohio Dec. 18, 2008) (relaxing the pleading standard where the relator had personal knowledge of false claims by virtue of his position as defendant's Assistant Director of Cardiology and attached to his complaint specific patient data and UB-92 forms that hospital actually submitted for payment by government).

In the present case, the relator has not alleged facts to warrant relaxation of Rule 9(b)'s "strict requirement that relators identify actual false claims." *Chesbrough*, 655 F.3d at 472. The relator never worked as an employee of HMA or UMC, and he does not allege any other facts showing that he has personal, first-hand knowledge or involvement with the defendants' billing and claim-submission process, and no knowledge that claims were actually submitted by the defendants. He also does not identify any persons or entities that participated in any step of that process. Second, as discussed above, the relator has not otherwise alleged facts showing the existence of an illegal scheme. As a result, the relator simply has not pleaded facts that support a "strong" inference that any physician with an alleged improper financial arrangement with the defendants referred Medicare or Medicaid patients, or that UMC sought reimbursement from Medicare or Medicaid for those services. *Cf. Sanderson*, 447 F.3d at 877-78 (holding that Rule 9(b) requires *qui tam* relators to do more than merely argue that "that claims requesting illegal payments must have been submitted, were likely submitted or should have been submitted to the Government").

In sum, the amended complaint does not allege actual facts to support the relator's first claim for relief under the FCA because it contains no specific factual allegations regarding the existence of a

fraudulent scheme or the presentment of a false claim to the government arising from such scheme. The first claim for relief, and the analogous state-law claim, are subject to dismissal on this basis.

**B.    The Complaint Fails to Adequately Allege the Knowing Use of False Record or Statement as Required to Support the Second Claim for Relief**

To establish a post-FERA claim for relief under § 3729(a)(1)(B), the relator must allege that the defendants knowingly made or used, or caused to be made or used, a false record or statement material to a false or fraudulent claim. As set forth above, the relator fails to adequately identify any a false or fraudulent claim. On that basis alone, the relator's second claim for relief is subject to dismissal. In addition, he has also not shown that the defendants knowingly made or used, or caused to be made or used, a false record or statement. As with a claim under other provisions of § 3729, a claim for relief under § 3729(a)(1)(B), to satisfy Rule 9(b) scrutiny, must provide sufficient detail regarding the time, place and content of the defendant's allege false statements and the claim for payment. *Bennett v. MIS Corp.*, 607 F.3d 1076, 1100 (6th Cir. 2010)

Whether analyzed under the FERA amendments or not, the amended complaint fails to provide sufficient detail to support the relator's claim regarding the knowing fabrication or use of a false record or statement that was used in support of a false or fraudulent claim. The amended complaint fails to allege any particular facts regarding what false statements were made by the defendants, when they were made, who made them, or the content of the statements. Further, the amended complaint makes no allegations regarding any claims for payment submitted by UMC. Because bare-bones allegations about the alleged submission of false claims, devoid of any particularized facts, are insufficient as a matter of law under Rule 9(b), the claim under § 3729(a)(1)(B) is subject to dismissal.

**D.    Conspiracy Is Not Alleged with Sufficient Particularity to Support the Third Claim for Relief**

Rule 9(b)'s heightened pleading standard applies to FCA claims of conspiracy to defraud the government. *Marlar*, 525 F.3d at 445. Under Rule 9(b), general allegations of a conspiracy, without supporting facts to show when, where or how the alleged conspiracy occurred, amount to only a legal conclusion and are insufficient to state a cause of action. *See Vess v. Ciba-Geigy Corp. USA*, 317 F.3d 1097, 1106–07 (9th Cir. 2003). The amended complaint fails to allege any of the requisite elements of a conspiracy with the requisite specificity.

In fact, the amended complaint simply avers that "Defendants knowingly entered into unlawful

agreements with physicians and other healthcare providers . . . in furtherance of defendants' unlawful objectives." (FAC ¶ 140.) The agreements in question are the physician recruitment agreements. As discussed above, the relator has failed to show that the recruitment agreements (assuming UMC's recruitment agreements with other physicians are comparable to the relator's recruitment agreement with UMC) violate federal law.

The conspiracy claim too is subject to dismissal because it is not pleaded with the requisite specificity.

      **E.**     **The Complaint Fails to Adequately Plead a False Statement Made to Avoid an Obligation to the Government as Required to Support the Fourth Claim for Relief**

"To sustain a 'reverse' false claim under 31 U.S.C. § 3729(a)(7), the Government must show (1) that the Defendants made, used or caused to be used a statement or record to conceal, avoid or decrease an obligation to the United States; (2) that the statement or record was false or fraudulent; (3) that the Defendant knew the statement or record was false or fraudulent; and (4) that the Defendant 'made a false record or statement at a time that the defendant owed to the government an obligation sufficiently certain to give rise to an action of debt at common law.'" *United States ex rel. Augustine v. Century Health Servs.*, 136 F. Supp. 2d 876, 888 (M.D. Tenn. 2000) (quoting *Am. Textile Mfrs. Inst., Inc. v. The Limited, Inc.*, 190 F.3d 729, 737 (6th Cir. 1999)). A claim under this provision is called a "reverse" false claim because the action of the defendant results not in improper payment to the defendant from the government, but rather no payment (or reduced payment) to the government when payment is otherwise obligated. *United States ex rel. Doe v. Dow Chem. Co.*, 343 F.3d 325, 329 (5th Cir. 2003). A cause of action under § 3729(a)(7) is subject to the heightened pleading requirement of Rule 9(b). *Id.* at 529–30. That standard, applied to the pleading of a reverse false claim, requires the relator to plead "[t]he 'time, place and contents of the false representations, as well as the identity of the person making the misrepresentation and what [that person] obtained thereby.'" *Id.* at 329 (citation omitted).

It is unclear from the amended complaint in what way the relator believes the defendants violated the reverse-false-claims provision. The allegations in the amended complaint include only boilerplate assertions that simply restate that statutory language pertaining to reverse false claims. (*See* FAC ¶ 147). The relator fails to provide any specific factual allegations about what fraudulent record or statement the defendants made that caused them to avoid or decrease an obligation to pay the

government, who made such a record or statement, when it was made, where it was made, or its contents. Nowhere in the amended complaint does the relator allege any obligation owed by the defendants to the government that the defendants sought to conceal or avoid. As a result, the relator has failed to allege a cause of action for a "reverse" false claim under § 3729(a)(7) with the specificity required by Rule 9(b). This claim for relief too is therefore subject to dismissal.

## VI.    Conclusion

For the reasons stated herein, the Court finds that the amended complaint fails to state a claim under the FCA or analogous state law for which relief may be granted.

Generally speaking, the failure to properly plead fraud is not grounds for dismissal with prejudice. *United States ex rel. Bledsoe v. Cmty. Health Sys.*, 342 F.3d 634, 644 (6th Cir. 2003); *see also Yaldu v. Bank of America Corp.*, 700 F. Supp. 2d 832, 848 (E.D. Mich. 2010) ("[D]ismissal with prejudice on the basis of failure to plead with particularity ordinarily should be done only after the plaintiff has a chance to seek leave to amend the complaint." (citing *Bledsoe*, 342 F.3d at 644)). The defendants request that the dismissal be with prejudice, because "further attempts to amend the Complaint would be futile." (ECF No. 69, at 1.) In his response to the motion to dismiss, the relator specifically requests permission to replead any claims dismissed for lack of sufficient specificity.

The Court finds that, while it appears unlikely that the relator is in possession of facts that will permit him to plead fraud with any greater specificity, he has only amended his complaint once, prior to the defendants' having filed any answer or responsive pleading. The Court therefore finds that dismissal with prejudice is inappropriate at this juncture. The dismissal will therefore be without prejudice.

An appropriate order is filed herewith.

_____
Thomas A. Wiseman, Jr.
Senior United States District Judge